IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JULIUS ADAMS, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| v. | Civil Action No. 13-cv-7133 (JBS/AMD) |
| CITY OF ATLANTIC CITY, ACPD OFFICER FRANK TIMEK, ACPD OFFICER BRENT DOOLEY, ACPD OFFICER KYLE EISENBEIS, and ACPD SERGEANT DARYL HALL, et al., | **OPINION** |
| Defendants. | |

APPEARANCES:

Jennifer Ann Bonjean, Esq.
BONJEAN LAW GROUP PLLC
1000 Dean St., Suite 345
Brooklyn, NY 11238
      Counsel for Plaintiff

A. Michael Barker, Esq.
Todd J. Gelfand, Esq.
BARKER, GELFAND & JAMES
Linwood Greene
210 New Road, Suite 12
Linwood, NJ 08221
      Counsel for Defendant City of Atlantic City

Tracy Riley, Esq.
LAW OFFICES OF RILEY & RILEY
100 High Street, Suite 302
Mt. Holly, NJ 08060
      Counsel for Defendants Timek, Dooley, Eisenbeis, and Hall

**SIMANDLE, Judge:**

## I.    INTRODUCTION

This matter is before the Court on Defendant City of Atlantic City's ("Atlantic City") Motion for Summary Judgment [Docket Item 200], as well as Defendants Atlantic City Police Department ("ACPD") Officer Frank Timek, ACPD Officer Brent Dooley, ACPD Officer Kyle Eisenbeis, and ACPD Sergeant Daryl Hall's ("Individual Defendants") Motion for Summary Judgment [Docket Item 195].  In this case, Plaintiff Julius Adams ("Adams") claims his Fourth Amendment rights were violated when Atlantic City police officers conspired to use, and did use, excessive force against him during an encounter on the Atlantic City boardwalk. Plaintiff also claims that Atlantic City is liable under 42 U.S.C. § 1983 for failing to meaningfully investigate Internal Affairs complaints and failing to supervise, discipline, and train its officers with regard to officers' use of excessive force and use of K-9s (i.e., police dogs).

Plaintiff filed his amended complaint in this Court on June 3, 2014, against, inter alia, Individual Defendants and Atlantic City. [Docket Item 34.] In due course, Defendants Timek, Dooley, Eisenbeis, Hall, ACPD Commander James V. Pasquale, and ACPD Officer Matthew Rogers filed their motion for summary judgment. [Docket Item 195.] Plaintiff subsequently filed stipulations of dismissal as to Defendant Pasquale [Docket Item 235] and

Defendant Rogers [Docket Item 236], and a response in opposition to the Individual Defendants' Motion [Docket Item 230]. Atlantic City also filed its motion for summary judgment [Docket Item 200], and Plaintiff filed a response in opposition [Docket Item 228]. Individual Defendants filed a reply [Docket Item 234], as did Atlantic City [Docket Item 233].

For the reasons stated herein, the Court will deny Individual Defendants' motion for summary judgment with regard to Plaintiff's excessive force and civil conspiracy claims and Atlantic City's motion for summary judgment with regard to Plaintiff's § 1983 municipal liability claim for failure to investigate, supervise, and discipline. The Court will also deny Atlantic City's motion for summary judgment with regard to the claim of failure to train K-9 handlers. The Court will grant Atlantic City's motion for summary judgment with regard to Plaintiff's § 1983 claim for failure to train non-K-9 officers regarding excessive force.

## II. BACKGROUND[1]

### A. Factual Background

---

[1] Where not otherwise noted, factual allegations stated herein are found in Atlantic City's Statement of Undisputed Material Facts [Docket Item 200-2] and admitted to in Plaintiff's response thereto [Docket Item 229], or in Individual Defendants' Statement of Undisputed Material Facts [Docket Item 195-5] and admitted to in Plaintiff's response thereto [Docket Item 232].

## 1. June 17, 2011 Incident

On June 17, 2011, Plaintiff and a friend left a casino in
Adams's car, when police stopped them. [Docket Item 195-7,
Deposition of Julius Adams ("Adams Dep."), at 18:7-11, 19:3-6.]
Two police officers initially made the stop but many police cars
quickly came to the scene. Adams testified that Officer Dooley,
one of the police officers at the traffic stop, assaulted him by
"slamming him into the hood of the car and roughing him up".
[Id. at 30:18-20.] Adams was taken back to the police station
and charged with drunk driving.

As a result of the traffic stop and encounter with Officer
Dooley, Adams filed a complaint with the Internal Affairs
Department of the ACPD sometime around September or October of
2011; however, he never received a response. [Id. at 34:14-25,
43:1-4.] In January of 2012, while in court for the drunk
driving charge, Adams claims that Officer Dooley and other
members of the police department threatened him by punching
their fists into their hands, inside the courtroom while the
judge was not present. [Id. at 48-49:24-25, 1-5.] He believed

---

Other facts are drawn from Plaintiff's Deposition [Docket Item
195-7], individual officers' police reports [Docket Item 195-8],
or other exhibits, and are uncontested unless otherwise noted.
The facts are construed in the light most favorable to Plaintiff
as the non-moving party. Scott v. Harris, 550 U.S. 372, 378
(2007).

these threats occurred because the officers were displeased with him filing a complaint with Internal Affairs. [Id. at 50:10-11.]

### 2. February 28, 2012 Incident

Adams's next encounter with the Atlantic City police occurred on February 28, 2012, when he was 50 years old. [Docket Item 200, Ex. F, at 17.] He was exiting Trump Plaza Casino by himself after gambling for approximately four hours. [Docket Item 195-7 at 53:20, 54:25, 55:1.] Adams walked out of the doors onto Pacific Avenue when he met up with Brian Norwood, a person he referred to as an acquaintance, and another man Adams had never met before. [Id. at 59:16-18, 62:9-10.] Adams and the two men took a left out of the casino and walked into a tunnel called Boardwalk Hall. Adams and the police officers who were present greatly dispute what happened next.

According to Adams, while he was walking through Boardwalk Hall, Officer Dooley and another unnamed officer drove up in their patrol car, got out, stopped the three men, and asked for their identification. [Id. at 63:6-10, 66:4-6.] Simultaneously, four other officers pulled up to the scene in their patrol cars. [Id. at 71:9-12.] While the unnamed officer took the three ID cards back to his police car, Officer Dooley, Timek, and a third officer had Adams, Norwood, and the other unidentified man up against the wall, restraining their movement. [Id. at 70:18-19, 71:19-21.]

The officer who first arrived at the scene with Officer Dooley then returned from checking the three men's ID cards at his car, pointed at Adams and said, "Is that him?" [Id. at 74:17-19.] Officer Timek went to his car and released his German Shepherd dog, Vader, who ran and attacked Adams on Timek's command. [Id. at 76:23-25, 77:1-4.] While the dog was biting Adams's leg, Officer Timek slammed Adams's head into the wall, dragged him to the ground, and put him in handcuffs. [Id. at 77:7-8.] Officer Dooley then left Norwood and started to hit Adams and drag him on the ground; the third officer who had initially arrived with Dooley left the third man joined in and "was on [Adams]." [Id. at 77:9-13.] The other three officers joined in and all six of them were began beating Adams, who described "flurries of hits and kicks and punches and hitting me with pipes.[2] I could feel them busting me across my head. . . . And it was a flurry of a good two and a half minutes of me almost being killed before the other cops came up. And I thought it was going to be over." [Id. at 77:14-20.]

At that point, Sergeant Hall and a handful of other officers arrived at the scene. [Id. at 77:19-24.) Adams pleaded with Sergeant Hall to make the officers stop and that he wasn't

---

[2] Adams later described the "pipes" in more detail: "Like a metal folding stick that goes back down. It opens up like an extension. . . . They [were] beating me with what looked like to me metal pipes that fold up." [Id. at 80:15-19.]

resisting arrest, to which Officer Timek "hollered: [']He kicked at my dog, Sarge.[']" [Id. at 77:21-24.] Sergeant Hall responded, "Oh, you like kicking dogs?" [Id. at 77:25, 78:1-6.) He opened the door to his patrol car, and let out another German Shepherd dog, Max, to attack Adams, and said "Let him kick this one." [Id.] Adams described the dogs "playing tug-of-war with my legs." [Id. at 78:3-6.] They then gave the dogs the command to stop, and Sergeant Hall kicked Adams twice in the side and "upside [Adams's] head." [Id. at 78:10-18.] He instructed Norwood and the third man to leave the scene "before the same thing happen[s] to you," using a racial slur and stating that he knew where they lived and threatening them not to say anything or the same thing would happen to them. (Id. at 85:8-12, 91:23-25, 92:1-7.) Adams described the police officers who participated in beating him "high-fiv[ing] each other" after Hall kicked Adams and put an end to the assault. [Id. at 88:19-21.]

Defendants' account regarding what happened that night varies greatly from Adams's testimony. According to Defendants, Officer Timek responded to the Boardwalk Hall's Georgia Avenue tunnel regarding a report made by a Boardwalk Hall security employee about "three black males in the Boardwalk Hall tunnel drinking/doing CDS [i.e., controlled dangerous substance] and requested that police respond"; Plaintiff states that the

"Boardwalk Hall security personnel called stating, it's not an emergency but three black males walked into the tunnel and he thinks they are either going to be doing drugs or drinking. Caller asked if ACPD can send an officer to send them away." [Docket Items 200-2 ¶ 3; 229 ¶ 3.] When the men saw the marked patrol car, Officer Timek saw one man shove his hand into his waistband and then immediately remove it, indicating to Officer Timek that he was trying to conceal something. [Docket Item 195-8 at 11.] Officer Timek got out of his patrol car, unholstered his gun, pointed it at the men, and told them to get against the wall. Timek stated that he was alone at this time. <u>Id.</u> As he approached, one of the men, who turned out to be Adams, began shouting profanities loudly. <u>Id.</u>

Officer Timek's police report is unclear as to when exactly Sergeant Hall arrived; however, it seems to suggest that Hall was there prior to when he arrived in Adams' version of events. To that effect, Timek's report states: "I called for my canine partner who exited my patrol vehicle and approached to assist. Simultaneously, I observed that Sergeant Hall was on scene and with his canine partner on lead. I placed my canine partner back into my patrol vehicle." <u>Id.</u> Timek approached Adams, requested that he calm down and not move, but instead Adams attempted to turn around and continued shouting profanities. Timek then states, without specifying when Officer Dooley arrived on the

scene, "Officer Dooley advised me that he had been in possession of a knife. For my safety, I took hold of the suspect and attempted to keep him facing away from my direction. I felt his upper body muscles tighten and heard him shout[,] 'You wanna grab on me, I[']m going to fuck you up!'" Id.

Officer Timek then states that Adams "abruptly attempted to spin around combatively into my direction," so Timek took Adams to the ground as Adams "violently resisted [Timek's] control." Id. Officer Timek, "unable to physically gain control of [Adams's] hands to successfully place handcuffs on him[,]" "advised [Adams] that he was under arrest and to stop resisting but he refused to comply"; nevertheless, Timek was able to get one handcuff on Adams during the struggle. Id. With regard to his fear of Adams, Timek noted Adams's large stature; physical strength; "thick winter coat with its pockets filled with various items[,]" which could possibly have included "another weapon"[3]; and the possibility that Adams, if he broke free "could

---

[3] Hall's police report states: "Adams had not been completely searched for any further weapons as he erupted into a rage after the discovery of the folding lock-blade and was still considered unsearched." [Docket Item 195-8 at 14.]

Dooley's report states that, after he arrived on the scene "with other marked patrol units," he got out of his car and "immediately approached a male later identified as Juli[u]s Adams. I ordered Adams to step back and take his hands out of his pockets for officer safety. . . . After an over the clothes pat down, I felt a hard object in his right pant pocket[,]" which Dooley believed to be a knife. Dooley took the knife out of Adams's pocket and threw it a short distance away, as Timek

have used the [unfastened second] handcuff as a weapon against [the police officers]." Id.

Timek then states that Sergeant Hall "approached with his canine partner," told Adams he was under arrest, and to stop resisting "or his canine partner would be deployed several times." [Id. at 11-12.] Timek states that, in response to Adams's continued "violent resist[ance]," "a canine apprehension was made on the suspect," though Adams continued to resist by "pulling his hands away, attempting to recover from the ground[,] and kicking at the canine." [Id. at 12.] Hall's report describes this as his canine "engag[ing] Adams['s] right thigh pant leg area as he rolled around with Timek on his back. Adams was able to get his left knee up and strike the K9 in the snout causing him to disengage and yelp. . . . K9 Max re-engaged Adams on the right upper calf. Adams now kicked K9 Max again in the face not once but twice with his left foot." [Id. at 14.] Hall describes Adams fighting not only with his dog, Max, but also with Timek, Dooley, and Eisenbeis. Id. Officer Eisenbeis admitted to "strik[ing]" Adams in the face one time and holding

---

"came over to assist me with Adams due to his irate behavior." Dooley then told Timek that he "retrieved a knife from Adams and that it was behind" Dooley; "Officer Timek stood by with Adams while I went to retrieve the knife behind me. As I turned my attention to gather the knife, I heard Adams say something to the effect of, you wanna grab me, I'm going to fuck you up." [Id. at 22.]

him down in order to subdue him. Id. at 18. Once the officers had subdued Adams, an ambulance was called and Adams was taken to the AtlantiCare Regional Medical Center. [Id. at 12.]

The EMS report states that Adams was bleeding from his right leg and reported having been bitten several times; EMS noted a "1 ½ to 2 inch" injury to Adams's right calf, noted on the diagram to have been inflicted to the back of Adam's calf. [Docket Item 200, Ex. E.]

While in the emergency room, Adams allegedly told the medical personnel that he was "busted by cops for buying drugs." [Docket Item 200, Exhibit F, at 18 of 60.] Timek stated that he "heard [Adams] state that he had been smoking CDS and drinking alcohol all day prior to arrest." [Docket Item 195-8 at 12.] Officer Rogers stated that Adams stated "he was 'high on cocaine' . . . repeatedly . . . [and] went on to state that 'I am just a user not a dealer, I shouldn't be here.'" [Id. at 20.] Adams disputes that he made those statements. [Docket Item 232 ¶ 19.]

Adams's medical records from AtlantiCare's ER reflect soft tissue damage to his right lower thigh; soft tissue swelling of the right lower leg; "leg laceration, closed head injury, chest wall injury, blunt abdominal trauma"; and bruised ribs, inter alia. [Docket Item 200, Ex. F, at 14-17.] Adams also got five stitches to his right calf. [Id. at 17.] The medical records

also note: "MULTIPLE SUPERFICIAL BITES TO RIGHT LATERAL LEG, laceration(s), the wound is approximately 6 cm(s) [2.4"], of the right calf[,]" as well as a "SMALL PUNCTURE WOUND NOTED" to the "RIGHT LOWER THIGH." [Id. at 20 of 60 (emphasis in original).] Elsewhere, they describe Adams's report of "pain in mouth since [d]ried blood in mouth[,]" "pain with respiration," an abdomen that was "tender to palpation[,]" swelling, and a laceration on the "left wrist, [d]ried blood[.]" [Id. at 28 of 60.] Adams also reported to the medical staff that the police kicked him "over and over again in the stomach until I pissed on myself"; the staff noted the presence of urine on his underpants. Id. At discharge, his diagnosis was described as follows: "Dog Bite; Chest Wall Injury; Leg Laceration; Blunt Abdominal Trauma; Closed Head Injury[.]" [Id., "Discharge Instructions."]

Adams's mug shot was taken at some point after he was treated at AtlantiCare; it shows his face and neck area. [Docket Item 195-17.] Defendants submit that the mug shot does not reflect the injuries Adams alleges he sustained. [Docket Items 234 at 3; 200-2 ¶ 41; 195-5 ¶ 42.] Plaintiff disputes this. [Docket Items 229 ¶ 41; 232 ¶ 42.]

On March 3, 2012, Adams returned to AtlantiCare because, hospital records reflect, "he [did] not know about the results of his testing because police took his papers." [Docket Item 200, Ex. H.] He reported "low back pain left thigh and calf

pain. Patient was arrested 2/28 for buying drugs.[4] States police kicked him in chest and abdomen, k 9 dogs bit his right leg. . . . Has sutures right calf, and pain swelling right thigh." <u>Id.</u>

### 3. ACPD's Internal Affairs Policies

Citizens may file complaints they have about encounters with Atlantic City police officers with ACPD's Internal Affairs Department. ACPD has an Early Warning System ("EWS") that notifies the Chief of Police whenever an officer triggers the system by accumulating more than three internal affairs complaints within a calendar year. However, the former ACPD chief of police between 2010 and 2013, Chief Ernest C. Jubilee, testified in his deposition that although he was made aware "every time a complaint is made against an officer" as well as when an officer would trigger the EWS, he did nothing to respond to those complaints or discipline the officer. [Docket Item 228-24 at 31, Ex. X, Jubilee Dep. at 116:3-5; 45, dep. at 170:17-172:25; 46, dep. at 173:1-6.)

Plaintiff retained Dr. Jon Shane, an associate professor of criminal justice at John Jay College of Criminal Justice, who submitted an expert report that examined ACPD's internal-affairs functioning and concluded that: "The Atlantic City Police Department did not properly implement this internal affairs

---

[4] Adams also disputes that he made such a statement, to the extent that one is implied. [Docket Item 232 ¶ 26.]

program as required by the New Jersey Attorney General's Office
and did not follow accepted industry standards in effect at the
time for conducting internal affairs investigations. The
Atlantic City Police Department also did not follow accepted
industry standards for identifying and addressing patterns and
trends of complaints against police officers." [Docket Item 200-
10 at 32.]

Additionally, Plaintiff's expert provided statistical
analysis that showed the national rate of sustained complaints
for excessive force in a department of similar size to ACPD is
12%, while ACPD's sustain rate for excessive force is 0.219%.
Id. at 56.

During his deposition, current ACPD Chief of Police Henry
White engaged in the following colloquy:

> Attorney Bonjean: Would you agree that two sustained
> findings of in excess of 550 complaints of excessive
> force between the years of 2007 and 2014 might have
> contributed to the public's perception that the
> Atlantic City Police Department was covering up or not
> taking internal affairs complaints seriously?

> Chief White: Yes.

[White Dep., Docket Item 228-5 at 16, 108:6-12.]

All of this, Plaintiff asserts, amounts to "deliberate
indifference" on the part of Defendant Atlantic City, allowing a
reasonable jury to conclude that the city is liable under § 1983
for failure to investigate complaints of excessive force.

### 4. Suspension of the K-9 Unit

In August of 2009, Atlantic City Mayor Lorenzo Langford
suspended ACPD's K-9 units from the streets, due to citizen
complaints over their misuse. [Docket Item 228-35 at 12-15,
Langford Dep. at 39:7-51:21.] Mayor Langford testified during
his deposition that a number of factors contributed to his
decision to suspend the unit, including: (1) members of the
community had repeatedly complained that dogs were being misused
and a large, vocal group of concerned citizens had stormed the
City Council demanding their removal from the streets; (2) he
was privy to the disproportionate number of civil rights cases
involving K9 "criminal apprehensions" that came before the City
Council for settlement approval and was sensitive to the expense
associated with litigating and resolving those cases; and (3)
he, personally, had witnessed an incident where ACPD K9 officers
were all too eager to release their K9s into a crowd as a means
of "crowd control". Id.

Christine Peterson[5] was hired as public safety director in
March of 2010 and was tasked with conducting a review of ACPD's
K-9 unit. [Docket Item 228-41, Peterson Dep., at 3-6.] At the
conclusion of Peterson's review, she authorized the return of

---

[5] Peterson's name appears as both "Peterson" and "Petersen"
throughout different exhibits in the evidentiary record. For
consistency's sake, the Court will refer to her using the
spelling "Peterson." [Docket Item 228-41 at 2.]

the patrol dogs on the condition that certain criteria were satisfied as set forth in her Directive 025-2010. [Docket Item 228-37, Directive 025-2010 and Revised K-9 Policy.] The directive first required officers to undergo medical and psychological examinations, and have their "personnel records and Internal Affairs files [reviewed] to determine present suitability" for reassignment to the K-9 Unit. Id. at 2. Second, the directive required that "all K-9 teams are required to be evaluated at an outside police K-9 training facility, by a recognized K-9 training expert . . . prior to authorization for return to active duty status." Id. at 3.

Plaintiff asserts that extensive discovery reveals that ACPD returned the dogs to the streets without satisfying the criteria set forth in Directive 025-2010. Chief White testified that he conducted a diligent search for any documents that would reflect compliance with the portion of the directive relating to the re-evaluation of the handlers and could find no document in ACPD's control that reflected that the K-9 handlers were reevaluated pursuant to Section IV of the selection criteria set forth in the K-9 policy, per Directive 025-2010. [Docket Item 228-48 at 9-12, 19, 24.] Additionally, the city is unable to produce any documentation that reflects that all of the K-9 units were evaluated by an outside facility and passed that evaluation. [Docket Item 228, Plaintiff's Resp., at 65-66.]

**B. Procedural Background**

On August 28, 2012, Adams entered a guilty plea in New Jersey State Court to an amended charge of fourth-degree harm to a law enforcement animal under N.J.S.A. 2C:29-3.1. [Docket Item 200-9 at 3-10.] During his court appearance on that date, the presiding judge asked, "What was the [law enforcement] animal's name?" before he began allocuting Adams. Id. at 3. The assistant prosecutor responded, "That's a good question, your Honor[,]" and Adams's public defender said, "It may have been Vader." Id. at 4. Adams was subsequently sworn in by the court and engaged in the following plea colloquy:

> THE COURT: Do you in fact understand what's happening here? You're entering a guilty plea to an amended charge of fourth-degree harm to a law enforcement animal.
>
> MR. ADAMS: Yes.
>
> . . .
>
> THE COURT: Are you pleading guilty because you believe you are guilty?
>
> MR. ADAMS: Yes.
>
> . . .
>
> THE COURT: Let's talk about the offense. Count 2 amended on February 28, 2012, were you in Atlantic City?
>
> MR. ADAMS: Yes.
>
> THE COURT: Did you there and then attempt to cause or in fact cause harm to a law enforcement officer animal

being operated by the Atlantic City police department with the name of Vader?

MR. ADAMS: Yes.

THE COURT: I understand the animal was engaged by the officers on you, is that right?

MR. ADAMS: Yes.

THE COURT: The dog was biting you.

MR. ADAMS: Yes.

THE COURT: Then you struck the dog in order to get the dog off of you.

MR. ADAMS: Yes.

THE COURT: Do you understand by doing so you were committing an offense because you shouldn't be striking the dog, is that right?

MR. ADAMS: I was just getting him off me.

THE COURT: But it's still against the law to hit him.

MR. ADAMS: I didn't know that, yes.

THE COURT: But you know it now.

MR. ADAMS: Yes.

THE COURT: You knew what you were doing at the time?

MR. ADAMS: Yes.

THE COURT: State satisfied?

MR. BERGMAN[, assistant prosecutor]: Thank you, Judge, yes.

THE COURT: Any questions for me, sir, about your guilty plea? Any questions, sir?

MR. ADAMS: Yes, the civil suit against Atlantic City Police Department.

THE COURT: I don't know the answer to that, sir. I
        mean, you're not prevented from bringing a lawsuit,
        but I can't tell you what the outcome would be and
        whether or not the State would use the fact that you
        pled guilty to striking Vader against you. I can't
        predict that. It could be, but I can't predict that.

        MR. ADAMS: Thank you.

Id. at 4-10. The agreed-upon sentence was a one-year suspended

sentence; the judge instructed Adams that he had "to remain law-

abiding and stay out of trouble for that one-year period after

which [he]'d have no more exposure on these charges. Anything

else pending against you from this incident will be dismissed."

Id. at 7.

        Adams subsequently filed suit in this court against the

following defendants, among others: Officers Dooley, Eisenbeis,

Hall, Pasquale, Rogers, and Timek, for excessive force in

violation of § 1983 and the Fourth Amendment and for civil

conspiracy; and the City of Atlantic City, for municipal

liability under § 1983.

        In due course, Atlantic City filed a motion for summary

judgment with regard to the municipal liability claims, as well

as the excessive force claims; Individual Defendants filed a

separate motion for summary judgment with regard to the

excessive force and civil conspiracy claims. Plaintiff has filed

Stipulations of Dismissal with regard to Defendants Pasquale and

Rogers and they are no longer parties to this action. [Docket Items 235, 236.]

## III. STANDARD OF REVIEW

At summary judgment, the moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In reviewing a motion for summary judgment, the court is required to examine the evidence in light most favorable to the non-moving party, and resolve all reasonable inferences in that party's favor. Scott v. Harris, 550 U.S. 372, 378 (2007); Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014).

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The non-moving party "need not match, item for item, each piece of evidence proffered by the movant," but must simply present more

than a "mere scintilla" of evidence on which a jury could reasonably find for the non-moving party. <u>Boyle v. Cty. of Allegheny Pennsylvania</u>, 139 F.3d 386, 393 (3d Cir. 1998)(quoting <u>Anderson</u>, 477 U.S. at 252).

## IV. DISCUSSION

### A. Individual Defendants' Liability

#### 1. Excessive Force

Plaintiff first claims that a genuine issue of material fact exists as to whether Defendant Officers used unreasonable (i.e., excessive) force in violation of his Fourth Amendment rights. The Court agrees that, taking the facts in the light most favorable to Plaintiff, a reasonable jury could determine that Defendants used unreasonable force while detaining Plaintiff.

Plaintiff and Defendants have two very different accounts of what occurred the night of the incident. Plaintiff claims that the officers, unprovoked, started beating him relentlessly, perhaps due to a prior encounter and Plaintiff's subsequent complaint to Internal Affairs. He contends, in effect, that they also used their police dogs in a sadistic and malicious manner, causing lasting injury to Plaintiff's person. He claims those actions were unreasonable and constituted a use of excessive force.

In contrast, Defendants contend that Plaintiff was conducting himself in a threatening and aggressive manner that warranted the force that was used to apprehend him. They also deny any allegations that they released two dogs to attack Plaintiff and that they were all ganging up around him, punching, kicking, and hitting him with pipes. Additionally, Defendants argue that Plaintiff's claim cannot survive summary judgment because the EMT records indicate that Plaintiff suffered from one, not two dog bites. [Docket Item 234, Ind. Def.s' Rep., at 3.] Defendants also contend that Adam's mug shot does not corroborate his version of events. Id. They claim that no reasonable finder of fact could credit the allegation that they used unreasonable or excessive force against Plaintiff, given this factual record.

"To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004)(quoting Abraham v. Raso, 183 F.3d 279, 288 (3d Cir. 1999)). Neither party disputes that the seizure here occurred, only whether the force used was reasonable or not.

The test for reasonableness under the Fourth Amendment is whether under the totality of the circumstances, "the officers' actions are 'objectively reasonable' in light of the facts and

circumstances confronting them, without regard to their underlying intent or motivations." Graham v. Connor, 490 U.S. 386, 397 (1989). An officer's use of force is judged using an objective standard; thus an officer's bad intentions will not make objectively reasonable force unreasonable, and an officer's good intentions will not make objectively unreasonable force become reasonable. Id. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. "Reasonableness under the Fourth Amendment should frequently remain a question for the jury," Abraham, 183 F.3d at 290. Factors to consider in determining the reasonableness of the officer's force include the severity of the crime, whether the suspect poses an immediate threat to the safety of officers or others, and whether the suspect is actively resisting arrest or trying to flee the scene. Graham, 490 U.S. at 396.

Here, Individual Defendants claim that on February 28, 2012, they were responding to a call reporting three men involved in illegal narcotic activity. The only evidence Defendants have put forth to support the actual occurrence of such illegal narcotic activity--notwithstanding the characterization of the location of the altercation as a high-drug-activity area--is Officer Timek's testimony of one,

unnamed, male stuffing his hand in his waist band and quickly
removing it in response to seeing the patrol car. Given that, it
would be very difficult, if not outright impossible, to say that
the severity of the crime being committed when the officers
arrived at the scene was great. Cf. Samoles v. Lacey Twp., No.
12-3066 FLW, 2014 WL 2602251, at *8 (D.N.J. June 11,
2014)(suspected armed robbery deemed severe crime and justified
officers pointing guns at plaintiffs while making the arrest);
Green v. New Jersey State Police, 246 F. App'x 158, 161 (3d Cir.
2007)(reasonable jury could find excessive force where officer
choked plaintiff, hit him in the head with a flashlight, and
kicked him while on the ground, when plaintiff was arrested for
a "non-violent offense" of drunk driving).

    Furthermore, although Plaintiff (apparently undisputedly)
was in possession of a knife prior to his encounter with the
police, a reasonable jury could conclude that he did not pose an
immediate threat to the officers. Third Circuit case law
acknowledges that officers facing individuals who are suspected
to be violent and known to be armed, are justified in using a
higher degree of physical force. Mellot v. Heemer, 161 F.3d 117,
122-123 (3d Cir. 1998). In Mellot, the court held that deputy
marshals effecting a court-ordered eviction were justified in
pointing loaded firearms at persons in the house and twice
pushing them into a chair, due to the presence of fewer than ten

officers to contend with five individuals, and the fact that
"the marshals had significant reason to fear armed
confrontation" in light of one individual's ownership of
numerous firearms and his previous threats to shoot any federal
agent who came onto his property. Id.

Here, however, Officer Dooley had searched Adams and taken
away his knife without incident early on in the encounter,
before any physical altercation occurred. Unlike Mellot, there
were only three individuals being detained, two of whom are not
alleged by Defendants to have been resisting or violent, and a
large number of officers, along with two police dogs, were
present. Although the Individual Defendants contend that Adams
was acting aggressively and violently, a reasonable jury could
credit Adams's version of events which contests this allegation,
and conclude that he did not pose an immediate threat to any of
the officers or other people in the area. According to Adams, he
was acting calmly and out of concern for his own well-being.
Defendants do not allege that Adams was committing a crime of
violence or that he ever threatened or intended to use the
knife. See Wade v. Colaner, No. CIV. A. 06-3715-FLW, 2010 WL
5479629, at *11 (D.N.J. Dec. 28, 2010)(holding officer used
excessive force notwithstanding the knowledge that the plaintiff
had a gun because "there was no uncertainty regarding the
location of [p]laintiff's weapon"); see also Kopec, 361 F.3d at

777 (holding that officer responding to trespass was not justified in his failure to respond to plaintiff's complaints of tight handcuffs because the officer was not in a dangerous environment at the time of the arrest). This Court, when considering this motion for summary judgment, is obliged to consider all disputed facts in the light most favorable to Plaintiff, the non-movant.

The parties further dispute whether Adams was actively resisting arrest at the time the alleged excessive force was used. The factual dispute between Plaintiff and Defendants about whether Plaintiff was acting violently and actively resisting arrest, or cooperating and being beaten without regard to his cooperation, is a precise example of factual dispute that must be resolved by a jury.

In Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014), a police officer ran the license plate number of a black Nissan and mistakenly concluded it was stolen. The plaintiff had pulled up to his parent's house, when the officer got out of his car and ordered the plaintiff to get down on the ground. Id. Hearing the commotion outside, the plaintiff's mother came out, and an argument ensued. Id. The defendant officer claimed that Tolan's mother "flipped her hands up" and told the officer to get his hands off of her, while the plaintiff and his mother testified that the officer slammed her against the garage door with such

force that she fell to the ground. Id. The plaintiff testified

that at this point he rose to his knees, while the officer

claims he rose to his feet. Id. The officer subsequently shot

the plaintiff three times without any warning. Id. The Supreme

Court overturned the 5th Circuit Court of Appeals's affirmance

of the district court's opinion that the officer's force was

reasonable (although the 5th Circuit affirmed on qualified

immunity grounds rather than 4th Amendment grounds), because the

lower courts did not view the facts in the light most favorable

to the plaintiff as the non-movant: "By weighing the evidence

and reaching factual inferences contrary to Tolan's competent

evidence, the court below neglected to adhere to the fundamental

principle that at the summary judgment stage, reasonable

inferences should be drawn in favor of the nonmoving party." Id.

at 1868.

Here, as in Tolan, Plaintiff and Individual Defendants

highly dispute the way Adams handled himself throughout the

encounter. This is a question of credibility and a reasonable

jury could credit Plaintiff's version of events, that he was not

resisting arrest, and rather was beaten by officers using

excessive force in light of the circumstances. See also Gorman

v. Twp. of Manalapan, 47 F.3d 628, 634 (3d Cir.

1995)(overturning the district court's ruling of summary

judgment in favor of defendant police officers because question

of credibility should be left up to the jury when both sides have far different accounts of what occurred).

The hospital records likewise reflect injuries that a reasonable finder of fact could use as support for Adams's account of the altercation. They do not support summary judgment for Defendants.

At this point in the litigation, taking the facts in a light most favorable to the non-movant, Defendants' arguments for summary judgment are not persuasive. A reasonable jury could find Plaintiff's version of events credible and conclude that Defendants used excessive force in violation of the Fourth Amendment during the process of arresting Plaintiff. The Court accordingly declines to grant summary judgment on Plaintiff's excessive force claims on that ground.

## 2. **Heck v. Humphrey**

Defendant Atlantic City advances the argument that <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994), bars Plaintiff's claim of excessive force by any K-9 by virtue of Plaintiff's guilty plea to fourth-degree harm to a law enforcement animal. Atlantic City raises this argument in their brief in support of their motion for summary judgment and again in their reply brief to Plaintiff's response. Individual Defendants do not raise this

argument in support of their motion for summary judgment on
Plaintiff's excessive force claims.[6]

Heck holds that a plaintiff may not bring an action under
§ 1983 if a judgment in the plaintiff's favor would contradict
the validity of a prior criminal conviction, unless that
judgment has been reversed on appeal or impaired in collateral
proceedings. 512 U.S. at 486-87. Heck describes "a § 1983 action
that does not seek damages directly attributable to conviction
or confinement but whose successful prosecution would
necessarily imply that the plaintiff's criminal conviction was
wrongful" as being one that would "have to negate an element of
the offense of which he has been convicted," and states that, as
a result, "the § 1983 action will not lie." Id. at 486 n.6.
Defendant Atlantic City argues that if Plaintiff prevailed on
his excessive force claim, it must follow that his conviction
for assaulting a law enforcement animal is invalid, because if
the K-9's or K-9s' force were found excessive or unlawful, the
defense of self-defense would have been available to Adams, but
negated by his guilty plea. This Court and Third Circuit
authority disagree.

---

[6] It is the Court's understanding that Atlantic City raises this
argument in hopes of dispensing with the excessive force claims
brought against Individual Defendants, thereby extinguishing any
derivative municipal liability claims under Monell brought
against the City by Plaintiff.

In <u>Garrison v. Porch</u>, 376 Fed. App'x 274, 278 (3d Cir. 2010), the defendant argued that because the plaintiff had pled guilty to resisting arrest and simple assault, he was barred by <u>Heck</u> from prevailing on his excessive force claim. The Third Circuit disagreed, holding: "The fact that Garrison's threatened or attempted use of force was unlawful does not automatically mean that there is no use of force that [the defendant officer] could have used in response which could have risen to the level of unreasonable and excessive." <u>Id.</u> at 278. The Third Circuit continued: "[O]ther courts of appeals . . . have generally held that the mere fact of a conviction for <u>assault or similar conviction</u> arising out of the same incident does not automatically preclude recovery on an excessive force claim brought under § 1983." <u>Id.</u> (emphasis added). In <u>Garrison</u>, the defendant officer made precisely the same argument regarding the availability of an affirmative defense of self-defense, stating that "because Garrison could have, but did not, use[] self-defense as an affirmative defense to the charge of simple assault, his conviction establishes as a matter of law that his conduct was not justified, and he is therefore barred by <u>Heck</u> from recovering on his excessive force claim." <u>Id.</u> The court rejected this argument, too, stating: "[T]he issue of self-defense is irrelevant" because Garrison claimed that after Garrison's

act of assault, Porch then responded by using a degree
of force that was much greater than was reasonably
necessary to subdue him and place him under arrest. .
. . . Garrison admits that . . . he acted in a . . .
manner, which constituted simple assault. At that
point, Garrison alleges that Porch responded by using
an excessive level of force . . . . There is no
logical inconsistency in these two assertions. A
reasonable jury could find that, even considering
Garrison's initial behavior which constituted a simple
assault, Porch used an unreasonable amount of force in
arresting him, and in doing so violated his
constitutional rights. Garrison's § 1983 claim is
therefore not barred by Heck[.]

Id. at 278-79.

    Here, Atlantic City argues that Garrison's focus on the

greater context of the interaction does not apply, because Adams

never claims he was bitten after he committed the assault on the

police dog for which he pled guilty. [Docket Item 233 at 10-12.]

This does not accurately represent the evidentiary record before

the Court. Plaintiff pled guilty to assaulting Officer Timek's

dog, Vader. Plaintiff alleges that Officer Timek's dog reengaged

after Plaintiff hit Vader, and continued to bite Adams, at the

same time that the Individual Defendants beat him. That occurred

after the conduct that was the basis for Adams's guilty plea.

Plaintiff also alleges that Sergeant Hall's dog, Max, attacked

him well after Adams hit Officer Timek's dog. "There is no

logical inconsistency" between Adams having hit Vader in

violation of N.J.S.A. 2C:29-3.1 and the Individual Defendants

subsequently having used excessive force by 1) having Vader

continue to bite Plaintiff; 2) beating Plaintiff themselves; or

3) subsequently having Max bite Plaintiff. <u>Garrison</u>, 376 Fed.

App'x at 279.

Atlantic City urges the Court to conclude that the plea

colloquy wherein Adams admitted to having hit Vader represented

an error suggested by Adams's attorney and uncorrected by the

State and the trial judge who took Adams's plea, and that, in

fact, Adams admitted to having struck Sgt. Hall's dog, Max.

Perhaps if it were established to the satisfaction of the finder

of fact that the law enforcement animal assaulted was in fact

Hall's dog rather than Timek's, a sequence of events could be

reconstructed where the <u>Heck</u> bar might apply. However, given the

clear allocution by Adams to having struck Vader (undisputedly

Officer Timek's dog), the Court declines to rule otherwise as a

matter of law on this summary judgment motion.

Alternatively, Defendant Atlantic City argues <u>Garrison</u> is

inapplicable because no reasonable jury could credit Plaintiff's

version of events:

> Although Defendant acknowledges that Plaintiff alleges
> Defendant Timek's dog Vader first apprehended
> Plaintiff, followed by K-9 Max; and under the above
> cited cases, hypothetically Plaintiff could have been
> pleading guilty to the assault on Vader thus 'Heck
> barring' a claim against Timek and Vader but still
> have an excessive force claim against Hall and K-9
> Max. However, no reasonable jury could find that any
> K-9 other than Max apprehended Plaintiff. There are no
> independent witnesses to confirm Plaintiff's version
> that two dogs were used. All of the defendant

> officers' reports and testimony are consistent in that
> regard. Furthermore, Hall's report states that Max
> apprehended Plaintiff at the thigh, then Plaintiff
> punched Max in the snout, at which time Max let go and
> then re-engaged at the calf. Plaintiff's own
> undisputed medical records confirm injuries consistent
> with the defendant officers' version.

[Docket Item 233, Atlantic City's Rep., at 11-12.] First, the
Court does not agree, as discussed above, that Plaintiff's
conviction for having assaulted Vader operates to "Heck-bar" his
claim against Timek. Second, the Court disagrees with Atlantic
City's characterization of the evidentiary record as not
allowing a reasonable finder of fact to conclude that any K-9
other than Max bit Plaintiff.

The police officers' corroboration of each others' versions
of events is not sufficient to grant summary judgment where
Plaintiff has presented contrary testimony, constituting
"competent evidence." Tolan, 134 S. Ct. at 1868. This
constitutes a genuine dispute of material fact.

Second, the hospital records may corroborate "injuries
consistent with the defendant officers' version"; they may
equally corroborate "injuries consistent with" Plaintiff's
version, as they reflect, inter alia, more than one dog-bite as
well as significant additional injuries (including internal
injuries that could reflect having been beaten, as Plaintiff
claims he was). They are not a basis to grant summary judgment.

These disputed events are exactly the kind of material facts a jury must decide. If Plaintiff's recollection of events is credited, a reasonable jury could conclude that Officer Timek and Sergeant Hall's dogs used excessive force at their direction, after the fact and in response to Mr. Adams's hitting Officer Timek's dog. See Benhaim v. Borough of Highland Park, 79 F. Supp. 3d 513, 520 (D.N.J. 2015)("The state court's finding that Benhaim was guilty of assault does not necessarily imply that Soden used only lawful force at all points in their interaction. Therefore, Heck does not bar Benhaim's claims against Soden"). See also Lora-Pena v. F.B.I., 529 F.3d 503, 506 (3d Cir. 2008)(holding "convictions for resisting arrest and assaulting officers would not be inconsistent with a holding that the officers, during a lawful arrest, used excessive (or unlawful) force in response to [a plaintiff's] unlawful actions."); Nelson v. Jashurek, 109 F.3d 142, 145 (3d Cir. 1997)(holding "it is possible for a finding that [the plaintiff] was resisting arrest to coexist with a finding that the police used excessive force to subdue him.")

For the reasons stated above, the Court declines to find that Plaintiff's claims of excessive force are Heck-barred, and will deny summary judgment on that ground.

**3. Civil Conspiracy**

Plaintiff next claims that Individual Defendants conspired to violate his civil rights by targeting him for unwarranted violence, subjecting him to malicious prosecution, coordinating false stories and reports against Plaintiff to incriminate him and rationalize violence and mistreatment, and coordinating their stories in order to conceal the extent of the damage that Defendants perpetrated against Plaintiff. [Docket Item 230 at 12-13.]

In order to state a claim of conspiracy pursuant to 42 U.S.C. § 1983, a plaintiff "must make specific factual allegations of a combination, agreement, or understanding among all or between any of the defendants to plot, plan, or conspire to carry out the alleged chain of events in order to deprive plaintiff of a federally protected right." Epifan v. Roman, No. 3:11-CV-02591-FLW, 2014 WL 4828606, at *5 (D.N.J. Sept. 29, 2014)(quoting Fioriglio v. City of Atlantic City, 996 F.Supp. 379, 385 (D.N.J. 1998)). To survive summary judgment, a plaintiff must show that there is a possibility that the jury can infer from the circumstances that the defendant's had a "meeting of the minds," and thus reached an understanding to achieve the conspiracies objectives. Id. at 386.

Here, Plaintiff argues that he was retaliated against after his June 17, 2011 traffic stop and subsequent complaint to ACPD's Internal Affairs. [Docket Item 230 at 12-13.] Plaintiff

testified that while in court for his June 17, drunk driving charge, Defendant Dooley and other officers made gestures indicating that they would retaliate against him for filing an Internal Affairs complaint. "I don't know the officers' names but I know Dooley because he had it in for me. But they was like this here (indicating) crushing they knuckles, pushing their hands together like breaking their knuck--you know, like breaking--you know how to crack our knuckles like, that kind of stuff they were doing." [Docket Item 230-1 at 28.] Further, during Plaintiff's encounter with police on February 28, 2012, he claims that prior to excessive force being used against him, an officer looked at Dooley after taking Plaintiff's ID card and said, "Is that him?" Id. at 22. Plaintiff contends that this set of facts leads to the reasonable inference that Defendant Dooley and at least one other officer involved in this incident agreed to violate Plaintiff's constitutional rights by beating him in retaliation for his prior filing of an internal affairs complaint against Dooley, and Plaintiff's vocal complaints about the Atlantic City Police Department. [Docket Item 230 at 13.] Plaintiff does not cite to any other evidence that specifically shows Defendants conspired to falsify police reports, coordinate their stories, or maliciously prosecute him.

Defendant asserts that Plaintiff's claim must fail because it is undisputed that the officers were dispatched to the

tunnel, therefore: "How were they to know Julius Adams was one of the individuals they were being dispatched to disperse?" [Docket Item 234 at 6.] They contend that it is unreasonable to infer that any Defendant officer recognized Plaintiff as someone who had attempted to file an internal affairs complaint in 2011. Id. Furthermore, Defendant argues that it is not enough to allege that Defendant Dooley and at least one other officer conspired; rather Plaintiff's claims must have more specificity to be sustained.

Based on the evidentiary record, the Court finds that a reasonable jury could conclude that Officer Dooley and at least one officer conspired to deprive Plaintiff of his constitutional right to be free from the use of excessive force. If Plaintiff's allegations are credited and Officer Dooley and other officers did in fact threaten Plaintiff in the courtroom, and later identified him as the person whom they threatened, and did then use excessive force against him, a reasonable jury could infer that those officers had a "meeting of the minds" and reached an understanding to inflict excessive force on Plaintiff as a punishment in retaliation for his complaints to Internal Affairs. See United States v. Rorke, No. CRIM. A. 90-485, 1991 WL 165275, at *4 (E.D. Pa. Aug. 22, 1991), aff'd, 972 F.2d 1334 (3d Cir. 1992)("Although no direct evidence of the existence of a conspiracy to inflict excessive force was produced, such

evidence is not necessary. . . . The fact that these beatings were committed by the policemen acting together provided a sufficient basis for the jury to conclude that the policemen were conspiring, or acting in concert, to deprive Smith, Jr. of his constitutional right to be free from excessive force").

The existence of material facts in genuine dispute is sufficient to deny Defendants' motion for summary judgment as to Plaintiff's claim of civil conspiracy.

### B. Monell Claims against Atlantic City

#### 1. Failure to Investigate

Plaintiff claims that Atlantic City should be liable for the excessive force used by Individual Defendants because a genuine issue of material fact exists as to whether Atlantic City has a widespread, well-settled practice or custom of permitting its officers to employ excessive force without fear of discipline by routinely failing to properly investigate internal affairs complaints. (Pl. Br. at 16.)

In Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658 (1978), the Supreme Court established that municipalities and other government entities were "persons" subject to liability under 42 U.S.C. § 1983 for constitutional rights violations, but that they were not liable under the doctrine of respondeat superior for the misconduct of their employees. Monell, 436 U.S. at 690-692; see also City of Oklahoma City v.

Tuttle, 471 U.S. 808, 810 (1985). To prevail on a Monell claim, a plaintiff must first establish that the municipality had a policy or custom that deprived him of his constitutional rights. McTernan v. City of York, 564 F.3d 636, 657 (3d Cir. 2009)(quoting Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996)). In other words, the plaintiff must show that the municipality, through one of its policymakers, affirmatively proclaimed the policy, or acquiesced in the widespread custom, that caused the violation. Watson v. Abington Twp., 478 F.3d 144, 155-156 (3d Cir. 2007). A plaintiff may show the existence of a policy when a decision maker with final authority issues an official proclamation, policy, or edict. Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990). Custom may be established by showing that a given course of conduct, "although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." Id.; see also Watson, 478 F.3d at 155-156; Natale v. Camden Cty. Corr. Fac., 318 F.3d 575, 584 (3d Cir. 2003)(defining "custom" as "'an act that has not been formally approved by an appropriate decision maker,' but that is 'so widespread as to have the force of law.'" (quoting Board of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 404 (1997))).

Once a § 1983 plaintiff identifies a municipal policy or custom, he must "demonstrate that, through its deliberate

conduct, the municipality was the 'moving force' behind the injury alleged." <u>Brown</u>, 520 U.S. at 404. If the policy or custom does not facially violate federal law, causation can be established only by "demonstrat[ing] that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." <u>Id.</u> at 407 (citations omitted); <u>Berg v. Cty. of Allegheny</u>, 219 F.3d 261, 276 (3d Cir. 2000).[7]

The seminal case concerning the failure to investigate civilian complaints in the Third Circuit is <u>Beck</u>, 89 F.3d at 966. In <u>Beck</u>, the plaintiff presented municipal reports containing statistical information regarding excessive force complaints, as well as testimony of municipal officials who explained that the municipality treats each complaint against an officer as an independent event, and does not consider prior unsustained complaints against officers when investigating a pending complaint. <u>Id.</u> at 969-70. The court held that the evidence proffered by the plaintiff was enough for a reasonable

_____

[7] Proof of the existence of an unlawful policy or custom is not enough to maintain a § 1983 action. A plaintiff must additionally prove that the policy or custom was the proximate cause of the injuries suffered. <u>Watson</u>, 478 F.3d at 156; <u>Losch v. Borough of Parkesburg</u>, 736 F.2d 903, 910 (3d Cir. 1984). To establish causation, the plaintiff must demonstrate a "plausible nexus" or "affirmative link" between the custom and the specific deprivation of constitutional rights at issue. <u>Bielevicz</u>, 915 F.2d at 850.

jury to impute liability to the municipality, reasoning: "It is not enough that an investigative process be in place; . . . The investigative process must be real. It must have some teeth. It must answer to the citizen by providing at least a rudimentary chance of redress when injustice is done. The mere fact of investigation for the sake of investigation does not fulfill a city's obligation to its citizens." Id. at 974.

Defendant cites Frank v. Cape May County, No. 07-6005, 2010 WL 3614193, at *12 (D.N.J. Sept. 8, 2010), to argue that Plaintiff's citation to the sheer number of unsustained complaints in this evidentiary record is not enough to survive summary judgment. Rather, Defendant claims that Plaintiff must show why the prior incidents were wrongly decided and how the misconduct here is similar to those cases. To the extent the Defendant relies on Frank to support its position that no reasonable jury could find a policy or custom in the Atlantic City Police Department of condoning excessive force by failing to discipline its officers or properly investigate internal affair complaints, the Court disagrees. In Frank, the plaintiff produced virtually no evidence that the Police Department had a custom or policy of not properly investigating civilian complaints. Id. at *11. The only incident to which the plaintiff drew the court's attention was one prior excessive force complaint against the arresting officer, which was abandoned by

the civilian before ever turning into a written complaint. Id. at *12.

Here, Plaintiff supports this claim by first citing the number of excessive force complaints filed against Defendant Officers Timek, Hall, Dooley, Rogers, and Eisenbeis. Between 1990 and 2014, these officers have accumulated sixty-three complaints that involve assault or excessive force, although no complaint has been sustained. [Docket Item 228 at 16-17, citing Docket Item 228-3, Ex. C.] Officer Timek alone has received forty-four Internal Affairs complaints related to assault or excessive force; however, he testified at his deposition that he does not remember a single time he was warned or reprimanded by the police department. [Docket Items 228-1, Ex. A, at 26; 228-11, Ex. K (Timek Dep.), at 3.) Additionally, between 2007 and 2014, the ACPD Internal Affairs Department received more than 550 complaints of excessive force, of which only two were sustained. Nevertheless, complaints for excessive force result in medical attention for the complainant 71.9% of the time. [Docket Item 200-10 at 64.] Similar to the deficient procedures the internal affairs department in Beck had in place, Atlantic City's internal affairs department at best looks into every complaint in isolation and does not consider past complaints of excessive force against officers when investigating current complaints. [Docket Item 228-24 at 45-50; Docket Item 228-2, Ex.

B., at 32-46. 70-71.] Additionally, ACPD's Internal Affairs is far more likely to formally interview the complainant when the complaint comes from an internal rather than external source. [Docket Item 228-2 at 57-59.] Relatedly, Adams alleges that he was brushed aside when he attempted to follow up with internal affairs regarding the status of the pending investigation of his complaint.

Plaintiff points out several deficiencies in the investigative process of Internal Affairs: the likelihood that an external complainant will not be interviewed, the lack of responsiveness to individuals attempting to follow up on their complaint, and the complete lack of discipline or supervision when an officer triggers ACPD's Early Warning System. All of this together is enough for a reasonable jury to conclude that the ACPD maintained a deficient internal affairs department and failed to meaningfully investigate complaints made by civilians regarding officers' use of excessive force. See Beck, 89 F.3d at 971 (holding the high number of excessive force complaints against a single officer suggested that those occurrences were not isolated incidents, but rather were evidence of a pattern of dangerous behavior requiring intervention by the city); see also Garcia v. City of Newark, No. 08-1725, 2011 WL 689616 at *3-*5 (D.N.J. Feb. 16, 2011)(denying defendant municipality's motion for summary judgment because plaintiff presented evidence that

the six individual defendants together accounted for more than

55 excessive force complaints prior to the incident at issue);

D'Arrigo v. Gloucester City, No. CIV A 04-5967, 2007 WL 1755970,

at *13 (D.N.J. June 19, 2007)(holding a reasonable jury could

conclude that Gloucester City has a policy or custom of ignoring

unconstitutional excessive force, and is deliberately

indifferent to excessive force in violation of the Fourth

Amendment by virtue of twenty-five years' worth of excessive

force complaints without a single officer being disciplined);

Sims v. Tropicana Entm't, Inc., No. 13-1981, 2016 WL 4801431, at

*7 (D.N.J. Sept. 9, 2016)(plaintiff demonstrated a genuine issue

of material fact by introducing evidence that the police officer

accused of excessive force was subject to six internal affairs

complaints in the three years prior to plaintiff's arrest); Day

v. Jackson Twp., No. 10-4011, 2013 WL 394151, at *11 (D.N.J.

Jan. 30, 2013)(denying summary judgment for municipality because

plaintiff alleged that in a five year period the police

department investigated fifteen excessive force complaints, none

of which resulted in disciplinary action, and three of the four

defendant officers had previously been investigated for

excessive use of force but exonerated); Noble v. City of Camden,

112 F. Supp. 3d 208, 224 (D.N.J. 2015)(denying summary judgment

on Monell claim against the city for failure to properly

investigate and/or discipline officers accused of using

excessive force when plaintiff's expert presented evidence that
defendant officers and police department as a whole had a
history of a large number of excessive force claims without any
disciplinary measures being taken).

Furthermore, the Court also finds that the link between
deficient Internal Affairs investigations and the injury to
Plaintiff in this case is not too tenuous to allow a jury to
determine the issue of proximate cause.

Defendant argues that Plaintiff cannot show that the volume
of police use-of-force complaints (without any finding of
excessive or unreasonable force) caused Plaintiff's injuries.
[Docket Item 233 at 14-17.] Plaintiff need not show his injuries
were the direct result of faulty departmental procedures to
satisfy the nexus requirement. <u>Bielevicz</u>, 915 F.2d at 851.
Rather, Plaintiff must simply show "a municipal custom coupled
with causation--i.e., that policymakers were aware of similar
unlawful conduct in the past, but failed to take precautions
against future violations, and that this failure, at least in
part, led to [Plaintiff's] injury." <u>Id.</u> "If the City is shown to
have tolerated known misconduct by police officers, the issue
whether the City's inaction contributed to the individual
officers' decision to [act] unlawfully in this instance is a
question of fact for the jury." <u>Id.</u>

Former Chief Jubilee testified that ACPD tracked complaints against officers and informed the Chief of Police about the existence of a certain number of Internal Affairs complaints made against specific officers within a certain time frame "[t]o keep [the Chief of Police] informed of the particular officers who were getting the number of the complaints that they were." [Docket Item 228-24 at 45, Jubilee Dep. 172:8-11.] He continued:

> Q: Do you remember taking any action with respect to any [such] memo you received during your course and tenure as Chief of Police?
>
> A: No.

Id. at 45-46, Dep. 172:23-173:1. A reasonable finder of fact could conclude from this evidence, among other sources, that Atlantic City Police Department did not use their knowledge of complaints to institute any remedial action, policy changes, modifications to assignment, or discipline of officers. Jubilee further testified that he was notified when an Atlantic City police officer triggered the warning system by accumulating more than three internal affairs complaints within six months, but did nothing to respond to those complaints. Lieutenant Lee Hendricks, the City's designee on internal affairs, testified in 2015 that, as a matter of policy, the Chief of Police is informed every time an internal affairs complaint is made against an officer. [Docket Item 228-32 at 3, Hendricks Dep. 56:13-14.] However, when Jubilee was chief between the years

2010 and 2013, the department merely counted complaints and did nothing to address them. It is the earlier time period that is relevant in assessing Atlantic City's liability for these 2011-2012 incidents.

Plaintiff has put forth sufficient evidence to allow a reasonable jury to find that the Atlantic City Police Department and the City of Atlantic City were aware of the high volume of complaints of constitutional violations (including, specifically, complaints of excessive force) and did not take proper steps to investigate these complaints or discipline the officers, and that their failure to do so proximately caused the injuries Adams suffered. See Colburn v. Upper Darby Twp., 838 F.2d 663 (3d Cir. 1988)(holding that a municipality's failure to act, once it was on notice that its procedures were constitutionally deficient, created a fact question regarding causation); Merman v. City of Camden, 824 F. Supp. 2d 581, 594 (D.N.J. Sept. 8, 2010)("Were a jury to credit plaintiff's proofs that the City inadequately investigated its officers' alleged use of excessive force and other constitutional violations and failed to properly supervise and discipline its officers, a reasonable fact-finder could, in turn, conclude that the City's action, or lack thereof, constituted deliberate indifference and proximately caused plaintiff's injuries."). For that reason, the Court will deny summary judgment as to this claim for municipal

liability arising from failure to investigate and discipline officers accused of excessive force in making arrests.

## 2. Failure to Train, Supervise, and Discipline

Plaintiff alleges that a genuine issue of material fact exists regarding whether Atlantic City failed to train, supervise, and discipline its officers with regard to officers' use of excessive force. The Court will grant summary judgment in favor of Atlantic City on Plaintiff's municipal liability claims based on failure to train the non-K-9 officers, and deny summary judgment with regard to the claims based on failure to supervise and discipline all officers, and failure to train the K-9 officers.[8]

When deciding if a city should be liable for failure to train or supervise its officers, "the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." City of Canton v. Harris, 489 U.S. 378, 390 (1989). For liability to attach, the identified deficiency in a city's training program must be closely related to the plaintiff's injury. Id. at 392. The reason for this high standard is because to adopt a lower standard of fault and causation "would open municipalities to unprecedented liability under § 1983." Id. Therefore, Plaintiff's claim against the City

_____

[8] Factual disputes regarding training deficiencies of the Defendant K-9 officers are discussed in Part IV.B.3, below.

can succeed only if Plaintiff can show the City's failure to train constituted deliberate indifference to the constitutional rights of the citizens who come in contact with the police. Wright v. City of Philadelphia, 685 Fed. App'x 142, 145 (3d Cir. 2017). Ordinarily, "[a] pattern of similar constitutional violations by untrained employees" is necessary "to demonstrate deliberate indifference for purposes of failure to train." Thomas v. Cumberland Cty., 749 F.3d 217, 223 (3d Cir. 2014)(quoting Connick v. Thompson, 563 U.S. 51, 62 (2011)).

Plaintiff argues that ACPD officers engaged in routine use of excessive force against the citizens of Atlantic City and that the city did nothing to address the issue of excessive force in its department. [Docket Item 228 at 47.]

Additionally, Plaintiff's use-of-force expert Van Ness Bogardus stated: "The Atlantic City Police Department's Use of Force Policy did not offer adequate guidance to line level officers or dog handlers to prevent issues of unreasonable, unnecessary and excessive use of force in the form of [1] intimidating citizens with the presence of an ACPD attack dog, [2] 'gun pointing at an unarmed and non-threatening misdemeanor suspect,' [3] '. . . tackling[] suspects to the ground,' [4] 'delivery of approximately one strike to the suspect's facial area' and [5] attempts to further assist by holding him down while additional force was used, and [6] 'unwarranted K-9

aggression in the form of dog biting' an unarmed, immobilized, and non-threatening suspect." [Docket Item 228-40 at 9 (emphasis in original).]

Plaintiff further notes that the ACPD has a written policy that requires ACPD officers to undergo yearly performance evaluations; despite this, Lt. Hendricks admitted that ACPD was not in compliance with its own policy, and had only ordered three performance evaluations in the last five years. [Docket Item 228-33 at 6, Hendricks Dep. 100:11-24.] Likewise, Chief Jubilee testified that he was made aware when an officer triggered the Early Warning System, but did nothing to respond.

Given that evidence in the record, the Court finds that a reasonable finder of fact could find that the City exhibited deliberate indifference with regard to its failure to supervise and/or discipline ACPD officers with regard to the use of excessive force.

While there is significant evidence to support Plaintiff's claim with respect to failure to supervise and failure to discipline, there is clearly insufficient evidence regarding the failure to train aspects of Plaintiff's claims with regard to non-K-9 officers, as Plaintiff identifies no training deficiencies as to these non-K-9 officers.

Defendant argues that if Plaintiff's Fourth Amendment rights were violated by Defendant Officers' use of excessive

force, "it is absurd to suggest that it happened because the officers were not properly trained not to beat a defenseless person and instruct two dogs to maul him for sport or out of uncontrolled anger." [Docket Item 233 at 27.] The Court agrees with Defendant. Atlantic City has produced records indicating that ACPD officers regularly undergo yearly in-service training specifically in the area of use of force. [Docket Items 233-6, Ex. FF (Training Records for Defendant Timek) and -7, Ex. GG (2012 Use of Force Training Material).] Plaintiff has not cited to anything within the evidentiary record regarding any specific deficiencies in the Atlantic City Police Department's training program. See Lapella v. City of Atlantic City, No. 10-2454, 2012 WL 2952411, at *6 (D.N.J. July 18, 2012)(to sustain an inadequate training theory, plaintiff must identify the precise deficiency in training).

The Court will deny summary judgment on Plaintiff's Monell claims dealing with failure to supervise and failure to discipline, and grant summary judgment with respect to failure to train.

### 3. Monell Claims Related to K-9 Handlers

Plaintiff brings his next Monell claim arguing that Plaintiff's dog-bite injuries were caused by Atlantic City's failure to train, supervise, and discipline its K-9 handlers in accordance with the appropriate and constitutional use of patrol

dogs for "criminal apprehension." [Docket Item 228 at 54.]
Relatedly, Plaintiff claims that the ACPD has a practice of
condoning K-9 handlers' use of patrol dogs to bite non-
threatening, non-violent and impaired petty offenders. Id. at
76.

Plaintiff argues, specifically, that Atlantic City showed
deliberate indifference to the safety and well-being of the
citizens of Atlantic City when the ACPD re-deployed the K-9
patrol units in 2010 (after the Mayor suspended the unit in
2009) without satisfying the re-training and re-certification
criteria for their return, as set forth in public safety
director Christine Peterson's Directive 025-2010. Id. at 55.
This directive stated that K-9 officers were to undergo medical
and psychological examinations and have their "personnel records
and Internal Affairs files [reviewed] to determine present
suitability." [Docket Item 228-37 at 2.] Additionally, the
directive ordered that "[a]ll K-9 Teams are required to be
evaluated at an outside police K-9 training facility, by
recognized K-9 training expert . . . " Id. at 3.

Defendant argues in response that the "Mayor's decision to
suspend the unit, re-evaluate whether to have a K9 unit and
whether policy changes were necessary, along with re-certifying
and requiring psychological evaluations of the K9 officers, is
the antithesis of deliberate indifference." [Docket Item 233 at

30.] Defendant also argues that the City sought more stringent review and regulation of its K-9 unit as compared with what the Attorney General's K-9 Guidelines, or any other law, requires, thereby suggesting that compliance with old training requirements were sufficient. Id. at 30-31. This, Defendant argues, entitles it to summary judgment on Plaintiff's Monell claims regarding ACPD's actions with regard to its K-9 handlers. The Court disagrees.

Plaintiff has presented evidence that ACPD returned the dogs to the streets without satisfying the criteria set forth in Directive 025-2010. First, Plaintiff states that ACPD has produced no writing from any officer confirming that they complied with the Directive. [Docket Item 228 at 64.] Current Chief of Police Henry White testified at a deposition on April 15, 2016 that he conducted a search for any documents that would reflect compliance with the portion of the directive relating to the re-evaluation of the handlers and could find no documents in ACPD's care that reflected that the K-9 handlers were reevaluated pursuant to Section IV of the selection criteria set forth in the K-9 policy. [Docket Item 228-48 at 9-12.] Atlantic City also has failed to produce any documents that show that all of the K-9 handlers were evaluated, and passed evaluation, at an outside facility, as required by Peterson's directive. [Docket Item 228 at 65.] The evaluation requirement implies that

training would be offered by the outside facility to assure proficiency, yet there is no evidence that this outside training was provided and received.[9]

Dr. William M. Glass conducted psychological evaluations in accordance with Directive 025-2010; however, he also wrote a follow-up memo to Director Peterson and Captain Myers informing them that he "found some concerns" with three out of the thirteen candidates and wished to reevaluate them. [Docket Item 228-50, Ex. XX, at 4-5.] The city did not produce any evidence that these three candidates were re-interviewed by Dr. Glass, and the record seems, in fact, to suggest that the city ignored Glass's memo, argues Plaintiff. [Docket Item 228 at 70.]

Joe Rodriguez, the head K-9 trainer between 2010 and 2015, similarly voiced concerns over the appointment of Officer Timek and another officer to the K-9 unit due to concerns about their aggressive temperament, and was, in his words, "basically told" by his higher-ups to "go blow". [Docket Item 228-44, Ex. RR (Rodriguez Dep.), at 16, 41-42.] This is further evidence from which a jury could find that the City was indifferent to the

---

[9] Alternatively, the evaluation requirement could also imply that ACPD would itself provide additional training, which would then be evaluated by the outside facility; there is no evidence to suggest that additional training of this type was provided or received.

retraining and recertification requirements imposed upon its
canine handlers, due to prior documented deficiencies.

Additionally, Plaintiff presented a study of ACPD K-9
handler apprehensions from 2009, 2011 and 2012. Plaintiff gleans
from this study that out of the 42 apprehensions reviewed in
this time period, (1) fewer than 10% involved the suspect's use
of any weapon or object that could be used as a weapon; (2) only
two cases involved an on-scene officer or civilian who sought
medical treatment for physical injuries; (3) fewer than 5% of
cases involved the K-9 actually "finding" the suspect; (4)
greater than 50% of cases involved impaired or "under the
influence" suspects; and (5) in all but a handful of cases, the
precipitating offense was a non-violent offense or merely an
investigatory stop that uncovered no offense whatsoever. [Docket
Item 228-51 at 2-4.]

The Court finds that from this evidence, a reasonable jury
could conclude that this indifference to proper management of
the K-9 unit with regard to investigations, supervision, and
training was the "moving force" behind the excessive force used
against Adams by Officer Timek and Sergeant Hall and their K-9
partners. A genuine issue of material fact exists on Plaintiff's
Monell claim based on failure to train, supervise, and
discipline its K-9 handlers, and therefore summary judgment is

denied. <u>See</u> <u>Castellani v. City of Atl. City</u>, No. CV 13-5848,

2017 WL 3112820, at *23 (D.N.J. July 21, 2017).

In summary, the Court will deny Defendant Atlantic City's

motion for summary judgment as to all <u>Monell</u> claims against the

City of Atlantic City with the exception of the <u>Monell</u> claim for

failure to train the regular non-canine unit officers, as to

which there is no evidence and summary judgment will be granted

for Atlantic City.


**V.    CONCLUSION**

For the reasons cited above, the Court will grant in part

and deny in part Defendants' motions for summary judgment. The

accompanying Order will be entered and counsel shall prepare

their Joint Final Pretrial Order at this time.



 **February 13, 2018**                          **s/ Jerome B. Simandle**
Date                                             JEROME B. SIMANDLE
                                                 U.S. District Judge